[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I.
The plaintiff-husband (PLTF) initiated this dissolution action in which he alleges an irretrievable breakdown of the marriage and seeks a dissolution, alimony, custody and support of a minor child, the family home and equitable division of other assets. The defendant-wife (DEFT) entered her answer and cross-complaint. The PLTF also alleged in his complaint the CT Page 404 intolerable cruelty of the DEFT as a ground for dissolution. This allegation is the only one denied by the DEFT in her answer. She sets forth in substance the same claims for relief as the PLTF.
Preliminary findings and conclusions will be made in this memorandum, followed thereafter with an order of the Court; then, further findings and conclusions with articulations deemed helpful and pertinent to the issues and the parties. The memorandum then will conclude with final orders of the Court again supported by pertinent statements.
Let me state, at the outset, that I have reviewed carefully my rather copious notes on the testimony parties especially which was received in a number of days over several months. I have also examined carefully the many exhibits introduced and the many well prepared claims and written memoranda submitted by the three attorneys presenting the case. All of this was done having in mind the various factors set forth in Conn. Gen. Stats., Sections 46b-81, 46b-82, 46b-84,46b-62, 46b-56, 46b-56a, in setting up the orders for alimony, support, division of property, etc.
 I.
Preliminarily therefore, it is found that the parties were married in February 8, 1986 at Harden, Connecticut. Both of the parties have resided in this State for the requisite period of one year prior to the filing of the complaint on February 9, 1988 to establish the jurisdiction of the court to hear this matter. This is the first marriage of either party. One minor child was born to the parties and her name and date of birth are, Rachel Leigh Vincent, born June 25, 1987. Neither party nor the child has received or is receiving aid or care from the state or any political subdivision thereof.
This marriage is one of short duration and the parties have each testified that the marriage has broken down irretrievably. I would have found this to be a fact, after hearing the testimony, without their admissions. During the hearing it was abundantly clear that each had lost the original love and desire to be with the other. I shall dwell further on this in my treatment of the major issue confronting these two young people that of custody of and visitation with the child, Rachel.
At this time a finding is made that the CT Page 405 marriage has broken down irretrievably. However, on the additional ground of intolerable cruelty alleged by the plaintiff in his complaint, the burden of proof rests upon the plaintiff. He has not established by a preponderance of the evidence that the DEFT was intolerably cruel to him.
Accordingly, it is ordered that a decree dissolving this marriage on the ground of irretrievable breakdown may issue at this time.
 II.
Originally each party sought individual custody of the child, Rachel. Subsequently and at the beginning of the trial, the PLTF was willing to have joint custody. The DEFT did not alter her position. At the close of the hearing, the PLTF frustrated by the DEFT's actions reverted to his original position and sought sole custody of Rachel. I do not in any way hold this change in positions against him. I accept the change as being made in a spirit of compromise and done in an effort to reach a solution that would be in the best interests of the child.
At present, however, I find that we have two people who each love their child with great fervor and passion. They appear to have equal parenting skills with, however, a slight edge to be given to the mother. This evolves from the constant attendance of the child with the mother from her birth to the days of the hearing. The child's birthday is June 25, 1987. To the present day she has resided continuously with her mother for approximately three years and five months. The evidence received, from those in contact with her, establishes her good health, good appearance in person and dress, her good disposition and personality, her good rapport with young and old. It is a shame that this lovely child, who can offer so much pleasure and happiness to those around her, must in turn become the recipient of pain and suffering and suffer a diminution in the expression of joy and love from the two people who could and should be first and foremost in doing so. We must, therefore, deal with this always difficult problem of awarding custody and fixing visitation schedules where the parties are in disagreement.
The first issue is that of awarding joint custody. This does not appear to be feasible or practical and thus would not be in the best interests of this child. As pointed out by Dr. Gallalee in his report (p. 5): "Unless the parents stop CT Page 406 fighting, Rachel will be very likely to grow up confused and divided within herself." I do agree with the doctor's assessment of the situation. These two parents carry an inordinate amount of hostility toward each other. They both testified that they could not agree anymore on most matters and that included the care of Rachel.
Counsel for the child, appointed by the court, is to be commended for the for amount of time and effort put into this case; and for her well reasoned and concerned written report submitted for the court's consideration. While I can agree with much of her assessment of the persons involved in this family matter and the operative and underlying conclusions, I am unable to reach her ultimate conclusion that joint custody would be in the best interests of Rachel. With the enmity that exists and surfaces from time to time and considering the still tender age of the child, there is need for a single authority in this case.
Accordingly it is ordered that sole custody of the child, Rachel is awarded to the DEFT. This order is found to be, at this time, in the best interests of the child.
The question of visitation is also a serious and controversial one. Here again the feelings of the parties and their respective supporters are far too strong and self-serving rather than in the best interests of the child. From the live testimony presented in the case, I concur with the following statements made by Dr. Gallalee in his report:
 "However, the situation which exists among Rachel, her parents, and their respective families is potentially disastrous for Rachel's emotional well being. Clearly Rachel is caught in the middle not only between her two parents but also between their families. . . . The families of the parents must accept some of the responsibility for this state of affairs, because in their loyalty to their own family members, they have encouraged the conflict between Ms. Massaro and Mr. Vincent." (EXHIBIT 4, P. 5)
It is important to note another observation made by Dr. Gallalee in his report referring to Rachel's behaviour after a visit with her father and which was also testified to by the DEFT. CT Page 407
 "Our aspect of the parents' conflict is that each tends to attribute negative behaviour by Rachel to wrongdoing by the other parent. The fact is that the happiest child in the most well-adjusted home will sometime behaves (sic) badly. If Rachel behaves badly, it does not mean that she was put up to it by the other parent or that the other parent somehow caused the behaviour. Each parent needs to stop being suspicious of the other and begin giving the other parent the benefit of the doubt. It is likely that some of Rachel's negative behaviour reflects the conflict between the parents and the terrible pressure which this places on her." (EXHIBIT 4, P. 6)
In his live testimony Dr. Gallalee stated that he had not seen any evidence showing the PLTF to be petty, hateful or vindictive. In his report and in live testimony he supported visitation by the PLTF, but recommended no overnight visitation unless the DEFT approved. This recommendation was not his preference, however, as he stated in his report on page 7 as follows: "I do not believe that such visits in themselves (sic) would be detrimental to Rachel. . . It is to be hoped that Ms. Massaro would willingly allow Rachel to have overnight visits, based on Ms. Massaro wanting what is best for Rachel, including a close relationship to Mr. Vincent." The attorney for the child in her written memorandum commenting on this passage from Dr. Gallalee's report observes that, "The mother's unwillingness to cooperate with what is in the obvious best interest of the child should not be countenanced by this court."
In her testimony and in her written proposed orders the DEFT stated her oppositions to any overnight visitation for Rachel with her father. She also requests that orders regarding visitation continue the pendente lite requirement that the PLTF call for the child and return her and be present with the child during the entire visitation period. Counsel for the child concurs in the need for the PLTF to call for and return the child. The PLTF, on the other hand, is seeking custody and seeks for the DEFT "limited and restricted visitation" until certain specified conditions are complied with. DEFT suggests the PLTF's week-day visitation be fixed at the same day each week rather than alternating weekly with Tuesdays and Thursdays.
This child, Rachel is fortunate to have two parents who love her and want to do much for her. She is deserving CT Page 408 of the best that each can give her and each could give her much to make her a completely happy child as she grows older and matures. I will issue what I consider appropriate visitation orders later in this memorandum and will also provide for close monitoring by the Family Relations Division to help Rachel. Until these parents are able to think for themselves without allowing other family members to affect their own judgments; and until they are able to submerge their respective ill feelings against each other in favor of showering love upon this lovely child in her best interests. I believe they need adult counselling in this regard and the child needs monitoring by a Family Relations Division representative for her own welfare and appropriate development. Every effort should be made by the court to protect the child against any emotional impairment that might develop as she grows and becomes more discerning of the position she is in. There are too many problems and too many difficult and frustrating decisions for her to make unless the parents change. If she is having to make difficult and unpleasant choices against her natural desires, she should receive appropriate counselling and assistance at an early time.
 III.
On the question of fault, I cannot find the separation of the parties and the principal cause of the dissolution to be due entirely or primarily to either party. In this area they have both revealed immaturity and this probably because of their youth. I find from hearing both of them and from the professionals that both were influenced unduly by their respective family members. This may have clouded their own ability to see or realize the consequences of their actions towards each other. Instances of actions on each side, as aptly pointed out by their counsel in the memoranda submitted, can be referred to in detail but really is not necessary. The pendulum does not swing significantly in either direction. Both have brought about the downfall of this marriage.
 IV.
The following vital statistics regarding the parties, their education and employments are found. The PLTF was born March 4, 1959 and the DEFT was born on April 10, 1958. Thus they are thirty-one and thirty-two years of age respectively. At the time of their marriage (2-8-86) they were ages 27 and 28 respectively. CT Page 409 The parties had made plans to wed prior to February 8, 1986, but they were stopped. I accept the defendant's version that the stoppage was caused by the interference of the PLTF's mother and sister. This caused an immediate rift between the DEFT and the PLTF's mother and sister which, I find, persisted to the time of the hearing in this case. There is hostility between the DEFT and PLTF's mother and sister with the greater amount directed at the sister. The DEFT testified that the parties disagreed and argued on many items and she did not find him alone to be blamed. She also testified that, following an argument with her husband over something his sister said about her, he instituted the present action. I have carefully considered the complaints of the parties against each other. In addition to the disagreements involving family members on both sides, there were difficult problems of a financial nature. PLTF gave up his driving job to enter into a police career such as his father was engaged in. The DEFT objected to this change in employment. Here again, I find that there was interference by the DEFT's parents which influenced her. The interference consisted mainly of criticism of the PLTF for changing his method of earning a livelihood from truck driver to police officer. In the beginning and during the transition and training stage in the new position there was a reduction in the PLTF's earnings. The DEFT took up this criticism of the PLTF. He in turn resented her intrusion into his selection of a career when he had not been critical of her and her work. Her work did not produce much income for the new family. Also, both of these young newlyweds wanted more than they could afford and, as a result, went into debt. These financial problems which arose were also more than they could handle. In any event the PLTF stayed in his selection and at the hearing held the position of "Police Officer 2d" with an annual salary of $31,716 for a standard work week of 40 hours from 7/1/89 to 6/30/90. (Exhibit #1)
The PLTF's 1989 federal income tax return reported earnings of $37,362. This is confirmed by Exhibits #1 and 2, letter reports containing payroll and pension information from the office of the Controller of the City of New Haven. Exhibit #1 reports for the period, January 1 — October 27, 1989 as follows, "$23,109.34 (regular gross);" $5,778.33 additional earning for overtime, etc. Thus, total for the period in full time service is $28,887.67. In addition the PLTF earned extra compensation for private contractual duty during the same period in the sum of $2,588.19. The overall total of all work and other compensation is $31,475.86. Compensation earned by the PLTF for the period October 28, 1989 thru Dec. 31, 1989 is reported by the New Haven CT Page 410 Controller's Office in Exhibit 2 and shows that regular gross pay amounted to $5,489.28 with overtime additional of $594.71. The total additional earnings of $6,083.99 when added to $31,475.86 produce an overall total compensation earned by the PLTF for the year 1989 of $37,559.85. The PLTF did testify that he expected to receive much less overtime in 1990 and very little special contractual work because of the fiscal problems of the city and the overall economy of the New Haven and State. A recapitulation shows the PLTF's earnings for 1987, 1988 and 1989 to have been respectively $33,668, $25,333 and $37,559. In the same order, refunds for overpayments of taxes were $642., $1574., and $2608. (Exhibits 5, 6, 7). In the earliest year he worked as a truck driver; in the second year as a driver and apprentice patrolman and a full patrolman in 1989.
Before the marriage the PLTF had purchased a condominium (condo) for $44,500 carrying a $42,000 mortgage. The parties resided here for approximately one year. On February 24, 1987 the parties purchased the present home at 53 Essex Court, Sterling Village, Meriden, CT. The purchase price plus closing costs came to $98,193. At that time it was necessary to take out a new mortgage of $76,700 and a bridge loan of $22,700. (Exhibit E.) A month later on March 30, 1987 the original condo was sold for $85,900. At this closing both the existing mortgage of $41,888 and the above bridge loan were paid. The net proceeds to the parties were $15,198 (Exhibit F.)
The relationship of the parties suffered also from heavy financial problems which beset them right to the court proceedings for the dissolution. These problems developed primarily because the parties did not plan properly and lived beyond their income. During this marriage the PLTF was essentially the sole wage earner. DEFT was, prior to the birth of their daughter engaged in her own business which was never profitable. Whatever earnings were achieved were, by her own testimony, reinvested in the DEFT's business. With the birth of the child and the subsequent gall bladder operation of the DEFT near the end of December, 1987 and to the time of the court proceedings, the DEFT did no substantial work in her business. Her expenses were absorbed entirely by her father who made no claim against her for any of these.
The financial deficits of the parties also CT Page 411 resulted in part from the PLTF's change of occupation which for a period of time reduced his income. In addition the change in condos also resulted in a rather substantial increase in the monthly mortgage payments.
At the period of the hearings which extended over several months the financial problems had gotten out of control so that foreclosure proceedings were facing the parties. The PLTF had been ordered to make all payments on the condo. He had to borrow from his parents to meet the payments. This was reflected on his financial affidavit. The DEFT also showed heavy borrowings from her parents on her affidavit. The rather substantial amount ($30,000) was claimed by her to have been compiled by her on her computer. However, she also testified that this figure had not been calculated by her parents nor had they made any demand upon her for any such sum. After contemplating all of the circumstances of this case, it is my opinion that it would be equitable for each party to be solely responsible to their respective parents for any assistance received and it will be so ordered by the Court.
The parties testified that three major loans were incurred during the marriage. There was agreement and disagreement over the execution of the documents involved and the use of the proceeds. There were two separate $9,000. loans made from the New Haven Telephone Employees Federal Credit Union (Union). There is agreement that the proceeds of the first loan, which was obtained 1/29/87 (Exh. H), were used in major part to pay off a debt of approximately $7,000. on the PLTF's truck. The PLTF testified that he would agree to be responsible for $7,000. plus $1,000. of the total liabilities from the three loans. There was a third loan of approximately $5,000. which was placed through the Visa card of the parties. A recapitulation of these loans together with added charges including legal fees was presented to the Court in the form of a letter to the DEFT's attorney. This letter which came from the Union's attorney was attached to the PLTF's financial affidavit dated March 13, 1990. The letter sets forth four loans but the PLTF testified that loans one and four as set forth therein were one and the same. That letter sets forth the total debt then due as approximately $37,000. PLTF's offer to be responsible for $8,000 of this total debt was based on his claim that he had received no more than this from the proceeds borrowed. He testified that he had entrusted all the finances to his wife and that he did not know how she had spent the funds. I do not find either of these last two statements credible and so not established.
An examination of the file reveals the existence of an CT Page 412 Order of the Court on March 2, 1988 directing the PLTF to be responsible for all the liabilities then listed on his financial affidavit, as well as all expenses connected with the condo. This order is further stated as being entered by agreement. (File #105). PLTF's affidavit filed on 3/2/88 listed a credit union liability of $8,000. and a Visa card liability of $5,000.
The DEFT testified that she used $7500 from the second $9,000. loan to make a retainer payment to her attorney in this case. An examination of PLTF's Exhibit M (3 passbooks on Conn. Savings Bank) shows a deposit of $9,000. on January 25, 1988 and a withdrawal of $2,000. on Feb. 2, followed by a second withdrawal on Feb. 5, 1988 of $8,000. Both of these withdrawals were made by the DEFT. This savings account was in the name of "Diana L. Massaro C/F Rachel Leigh Vincent." Also on February 5, 1988 the DEFT withdrew $1911.64 from another Connecticut Savings Bank account which was in the joint names of the parties. This withdrawal closed out this account. (EXHIBIT B).
The DEFT testified to funds she had prior to the marriage and that she contributed to the payment of family expenses. There was submitted a brokerage house statement showing a payment received by the DEFT of $3865.56 on January 30, 1987. (Exh. L.). EXHIBIT 3 is a statement of a Savings and Security Plan in the DEFT'S maiden name listing a balance as of 11/14/86 of $18,348.10.
The DEFT graduated from high school in 1976 having taken secretarial and business courses. She was engaged in two periods of employment prior to setting up her own business of selling yarn products and conducting business classes therein. (EXHIBITS K N). Her first employment was with Telecommunications International Union to August 1983 where her earnings approximated $12,000. to $15,000. by her estimate. She also worked thereafter at Power Electric Inc., a business owned by her father. She worked here for about two years but testified that she could not remember her rate of compensation. Here she performed the following work: typing, filing, payroll preparation and various other duties of a clerical nature.
It is to be noted that the DEFT stipulated at the hearing that she could earn $15,000. annually. In addition the DEFT testified that she wanted to work part time until her daughter was enrolled in school. There was also testimony that her mother was very helpful in caring for the child whenever the DEFT was out of the home. CT Page 413
The DEFT was living with her parents and had been since her operation.
There are many more factual matters that were testified to. The PLTF testified that the DEFT had also used $3500. approximately from one of the principal loans but could not remember which. DEFT had much difficulty remembering a number of matters or contradicted them, thus reducing her credibility. Against the PLTF the evidence was clear that he had paid $4-$500 for one rifle and had purchased more without stated prices. This was his hobby. He had paid a fee for membership in a gun club. He also had expended over $1,000 for college tuition. DEFT acknowledged receiving a ring from the PLTF costing about $450. To recite more would be too long.
 VI.
The following additional Orders are entered:
1. Dr. Galalee's fee for appearance in court is set at $400.00. Each of the parties is ordered to pay the sum of $200.00 to Dr. Galalee within sixty (60) days from date.
2. Counsel for the child submitted her detailed statement of services rendered and her charge therefor. The sum of $2770. charged for 27.7 hours of work in this case is found to be reasonable. It is ordered that each of the parties shall pay one-half ($885) of $1770., the balance due, to said counsel as follows: each to pay one-half of $885 within three months from date, and the remaining one-half at the end of six months from date.
3. Here reference is made to the findings previously made regarding the custody of the child, Rachael. Joint custody for the reasons stated is not feasible and is truly not in the best interest of the child. Therefore, it is necessary to award custody to one of the parents.
Custody of the minor child, Rachel is, therefore, awarded to the DEFT-mother.
4. Visitation, reasonable and liberal, is awarded to the PLTF specifically as follows, but may be expanded by agreement of the parties in writing without need for further intervention of the court.
a. Tuesdays and Thursdays of each week from 9:00 a.m. to 2:00 p.m. This allows him five hours of visitation. PLTF may change a day of CT Page 414 visitation or the hours, if he cannot keep the above for reasons of work and provided he gives the DEFT not less than 24 hours notice in advance and also submits an alternative day or hours. Failing to meet the notice requirement will forfeit the right to the change in day or hours. This order shall start Tuesday, January 15, 1991.
b. Except as hereinafter set forth, PLTF shall have visitation on week-ends alternating Saturdays and Sundays as at present from 9:00 a.m. to 4:00 p.m. with the first of such visitations on Saturday, January 12, 1991 and the next shall be on Sunday, January 20, 1991 and continue alternating thereafter until (c) hereof.
c. I am mindful of the parties positions on overnight. I also have in mind the conflicting recommendations of Dr. Gallalee and the child's attorney, Attorney Curry, I do not concur with Dr. Gallalee that overnight visitation should be controlled by the custodial parent. However, a further period of time must be provided for, to allow counselling by the family relations division of the court and also monitoring of the child during this intervening period and immediately after the overnight visits commence.
Overnight visitation, therefore, shall commence on Saturday, April 6, 1991 starting at 9:00 a.m. and ending Sunday at 4:00 p.m. That will be the only overnight visit in April. Starting May 4, 1991 there will be two weekend visitations with the same hours and the second overnight will be on Saturday, May 18, 1991 and will continue monthly thereafter on the first and third weekends until further order of the court. The PLTF may change a week-end for work reasons provided he notifies the DEFT on the Monday before the overnight visitation. On the other weekends the alternating schedule set up in "b." above shall prevail.
The family relations division shall closely monitor the visitations of the child to ascertain the effect upon the child and investigate any complaints the child or either parent may express and submit a report to the court at any time it deems the same to be necessary; and in any event not later than May 31, 1991.
d. Rachel shall spend Mother's Day with her mother and Father's Day with her father from 9:00 a.m. to 4:00 p.m.; and the DEFT's birthday with the DEFT and the PLTF's birthday with the PLTF with the same hours as Father's Day. CT Page 415
e. The parties shall each have the child for approximately one-half of her waking hours on her birthday, as well as Easter, Thanksgiving, Christmas and New Year's Day. The PLTF shall have the first half of the child's birthday this year and the parties shall alternate the shifts of hours in the succeeding holidays enumerated herein.
f. On the days before each of such holidays in "e" above excluding the child's birthday, the PLTF shall have visitation from 10:00 a.m. to 5:00 p.m.
g. During his two weeks of vacation, the PLTF shall have his daughter for one week of full visitation which means overnight. He shall be permitted to go out of State but shall be limited to travel in three States this year of 1991: Connecticut, New York and Massachusetts. He shall submit a complete itinerary of plans including travel plans for the week to the DEFT. This is to enable her to make one telephone call daily, at her expense, to the child. If the child wishes, the PLTF shall inform her that she may call her mother once each day. Long distance calls by the child will be paid for by the PLTF and shall not exceed five minutes each.
During the second week of his vacation the PLTF shall have daily visitation with his daughter from the hours of 10:00 a.m. to 4:00 p.m. unless he notifies the DEFT at least 48 hours in advance of any such day in which he will not have visitation. Any days missed during this week shall not be made up.
The PLTF shall notify the DEFT, not less than 90 days before, of the week he will exercise overnight visitation and the week of continuous daily visitation as outlined above. During the two weeks of vacation visitation, all other orders or rights of visitation shall be suspended.
h. The orders setting forth the PLTF's rights of visitation are for his benefit primarily. However his own family members cannot and should not be ignored. With respect to the involvement of the PLTF's family member, two matters are worthy of note. At on earlier custody pendente lite hearing, reflected in the court file as of 3/2/88, the presiding judge advised the PLTF to seek his family's help in caring for the child during his visitation. Before this Court the PLTF on redirect examination testified that his parents lived together, that their home had a third bedroom that was available to Rachel, and that he wished to leave his child with his parents for some part of his visitation CT Page 416 time. The second matter to be noted is the stipulation entered at this hearing that the DEFT was not always at home and her child was left with her parents at such times. The PLTF also testified that he did not begrudge the time the child spent alone with her maternal relatives and that he wished the same consideration for his relatives.
In the course of the hearing, I received no evidence adverse to the paternal grandparents or the other members of the PLTF's family with respect to the relationship between the child and them. The only criticism came from the DEFT who, solely as a matter of personal conflicts and not relating in any way to treatment of the child, was not too kindly disposed to the PLTF's mother and was clearly resentful of his sister. However, once again I state that this court must do equity, must not arbitrarily discriminate but must consider the best interests of the child as being always paramount.
It is Ordered that the PLTF shall at all times call for his child when exercising visitation rights and either he or one of his parents only, when he is unable to do so for health or work reasons, shall return the child to the mother's residence. The PLTF will be expected to spend as much time as he can with the child. However, he will not be expected under these visitation orders to spend all of his visitation time with his daughter. The parents and his sister are authorized to visit with Rachel. However, at this time these orders contemplate that either the PLTF or his mother will be present with Rachel at all times during visitation.
i. Neither the PLTF nor the DEFT nor any member of the families of either person shall speak disparagingly of either parent of the child in the presence of the child. The PLTF shall be reasonably prompt in calling for and returning the child and the DEFT shall be reasonably prompt in having Rachel ready when her father calls.
j. Except in an emergency the PLTF shall not seek any medical consultation or treatment for the child. He shall report his concerns to the DEFT. Any complaints thereafter shall be reported first to the Family Relations Division for mediation. If mediation fails, the Family Relations Officer assigned may refer the matter into court for further action, if such is deemed essential for the child's welfare. In addition either party may without waiting for mediation file the proper pleading to bring the matter back into court. CT Page 417
k. The PLTF shall maintain Blue Cross/Blue Shield Major medical including dental coverage or the equivalent thereof as available through his employment for the child, Rachel. Any uninsured or unreimbursed medical or dental expenses including orthodontic, ophthalmological, optical and pharmaceutical and psychological and psychiatric (subject to C. G. S.46b-84(c)) shall be paid for in the following proportions: the PLTF two-thirds and the DEFT one-third until the DEFT obtains full time employment, earning in excess of twelve thousand dollars annually. At that point the parties shall pay equally any expenses thereafter incurred on the child's behalf.
The DEFT shall advise the PLTF of all psychological and psychiatric, orthodontic and ophthalmological, surgical consultations, evaluations and treatments proposed to be performed including the names of the professionals to be involved with sufficient advance notice to permit the PLTF to take whatever action he deems to be in the best interests of the child.
l. SUPPORT. The PLTF shall pay to the DEFT the sum of $112. per week for the support of the child, Rachel commencing Friday, January 18, 1991 and each Friday thereafter during the child's minority or until further order of the court.
In arriving at this order I made two calculations using the guidelines. First, I calculated his gross weekly income at $657. using DEFT's Exhibit 1, par. 3 on page 2. Allowing $191 in deductions, his net came to $466. Using his income alone the support order came to $112. The second calculation was to use the stipulated earning capacity of $15,000 for the DEFT. I calculated her gross at $288.46 and her net at 183.18 with withholding and social security as the only deductions. Using $466. and $183, the combined disposable income is $649. and thus the support amount is $155. His percentage is .68, and the amount of support chargeable to him is $105.40. I opted for the higher figure for the child because the mother has not been producing any income from gainful employment and wants to devote more time to caring for the child and to conditions generally prevailing in employment at this time.
m. The PLTF is ordered to pay the sum of fifty ($50.00) dollars per week as periodic alimony for a period of two years starting Friday, January 18, 1991. This order shall not be modifiable to extend the term beyond two years and shall terminate upon CT Page 418 the happening of the first of the following events: 1. the remarriage of the DEFT, 2. the death of either party, 3. cohabitation by the DEFT pursuant to statute, 4. DEFT earning over $12,000 annually. An immediate wage execution shall issue for the payment of alimony and support.
n. At the hearing the parties' condo appeared to be in trouble because of foreclosure proceedings and the debt to the Union.
It is Ordered, that the condo shall become the sole property of the PLTF. The DEFT shall convey her undivided one-half interest in said property to the PLTF. The PLTF in turn shall execute and deliver his non-interest bearing promissory note in the face amount of Ten Thousand ($10,000.) Dollars. Said principal sum shall be paid as follows: $5,000. five years from date and the balance five years thereafter unless the property is sold by the PLTF before either of said dates. The balance due on said promissory note shall become payable in full upon the sale of said property by the PLTF.
The PLTF shall be responsible for and pay all the expenses for the repair and general maintenance of the condo, all mortgage payments of principal and interest, all insurance premiums, taxes and other levies, late charges, lien fees and attorney fees attributed to all of the foregoing items. He shall hold the DEFT harmless from any such expenses and charges and shall indemnify her for any damages suffered as a result thereof.
The promissory note from the PLTF to the DEFT shall provide for the payment of interest at the default in the payment of the principal as well as reasonable attorney's fees. Interest shall be at the prevailing legal rate at the time of default.
o. The PLTF is ordered to pay in full the pendente lite order for alimony and support (unallocated) until the permanent orders take effect.
p. Personal property located at the condo is awarded as follows: 1. Personal items shall be the sole property of each party. Those belonging to the PLTF shall be turned over to her forthwith. 2. Any wedding gifts shall be divided equally; 3. any child's furniture shall remain the property of the PLTF except such as the DEFT shall need at her present residence or a different residence when she shall set up the same. The child's property which the DEFT bought and is located at her parent's CT Page 419 residence shall be retained by the DEFT and used for the child. Any additional furniture needed for the child which the PLTF purchased for the child and is in the condo shall be turned over to the DEFT to become her property for the benefit of and use by the child.
DEFT and her relatives are not to enter into the condo to remove any property. She shall arrange for the removal of the same and pay for the removal by disinterested parties. She will contact the PLTF notifying him of the party who will do the moving and arrange for a mutually convenient date. The parties may appeal to the Family Relations Division to mediate any disputes or disagreements.
All the property not awarded herein to the DEFT shall be the sole property of the PLTF.
q. The PLTF shall cooperate with the DEFT to permit her to remain as a beneficiary on his medical insurance pursuant to the statute thereunto appertaining. For the first six months from the date of this judgment, the PLTF shall pay the extra premium cost. Thereafter, the DEFT shall be responsible for said cost and shall hold the PLTF harmless from any liability therefor and indemnify him if necessary. DEFT shall pay for all uninsured or unreimbursed expenses.
r. The DEFT shall have right or interest in or to any part of the PLTF's pension.
s. Each party shall maintain life insurance of not less than $10,000. with the child, Rachel designated as the irrevocable beneficiary during her minority.
u. As previously referred to, there are three principal liabilities owned to the Union. Reference is made to the letter from Attorneys Grady and Riley, attached to PLTF's financial affidavit and to EXHIBIT J. This exhibit is a copy of the writ, summons and complaint in three counts against the parties. The first two counts are against the PLTF alone and refer to the loans of $9,000 each referred to supra. The third count is against both parties and refers to the $5,000. loan processed through VISA CARD.
It is Ordered, that the PLTF shall be responsible for and pay one-half of the total debt to the Union including late charges, interest, penalty and attorney fees and the DEFT shall be responsible for and pay the other half. Each party shall save the other harmless from paying more CT Page 420 than one-half of such liability and shall indemnify the other for any damages suffered.
As to any other outstanding liabilities each party shall be liable for any such incurred by the party and shall hold the other harmless and indemnify.
v. The PLTF shall pay to counsel for the DEFT on account of counsel fees the sum of $1,000. dollars. The PLTF shall make four equal payments at three months intervals commencing April 1, 1991.
I believe I have covered all the required orders in this case. Counsel may submit, after notice to opposing counsel, any item believed to have been overlooked. There will be no hearing, but I will review any request submitted and reply to counsel.
Counsel are requested to collaborate in submitting to the undersigned a judgment file for signature.
JOHN OTTAVIANO JR. STATE TRIAL REFEREE